```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Shawn Patrick Krieger,           :

        Plaintiff,               :

    v.                           :      Case No. 2:12-cv-884

                                 :      JUDGE JAMES L. GRAHAM
Commissioner of Social Security,        Magistrate Judge Kemp

        Defendant.               :
```

                          REPORT AND RECOMMENDATION

                             I.  Introduction

Plaintiff, Shawn Patrick Krieger, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income (SSI). That application was filed on September 29, 2005, and alleged that plaintiff became disabled on May 15, 2004.

After initial administrative denials of his application, plaintiff was given a vidoeconference hearing before an Administrative Law Judge on October 28, 2008. On January 20, 2009, the ALJ issued a decision denying benefits. On review, the Appeals Council remanded the case for a new hearing. A second administrative hearing was held on July 1, 2011. Plaintiff appeared telephonically because, at that point, he was incarcerated. In a decision dated July 27, 2011, the ALJ denied benefits. That became the Commissioner's final decision on June 28, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on January 18, 2013. Plaintiff filed his statement of specific errors on March 15, 2013. The Commissioner filed a response on May 16, 2013. Plaintiff filed a reply brief on June 3, 2013, and the case is now ready to decide.

II. <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff, who was 39 years old at the time he allegedly became disabled and who has a high school education, testified as follows. His testimony appears at pages 564-595 and pages 607-623 of the administrative record.

At the first administrative hearing, plaintiff testified that he graduated from high school but spent a good bit of time in various institutions, and that he had also spent a year in prison. He had worked at an Applebee's restaurant for several years and experienced some difficulty dealing with people. He could not longer do that job due to hearing problems. He also worked for a contractor but left due to personality clashes with the owner. Many years before, he worked as a parts clerk at an auto dealer.

Plaintiff explained that he had problems with depression and was being treated for that illness. His depression had caused him to attempt suicide and he was hospitalized at least once after a suicide attempt. He also suffered from irritable bowel syndrome for which he took three kinds of medications. He had diabetes but was not insulin-dependent. Additionally, he got migraine headaches on rare occasions.

In addition to these conditions, plaintiff testified to pain in his neck on a regular basis and said that his low back would go out on occasion. He took Ultram for pain.

Plaintiff's household activities consisted of cooking, shopping, and other chores, which he was able to do when he was not sick. He was unable to function about one week out of every month. On a good day, he had an unlimited ability to sit, but on a bad day he would not sit at all. He could also stand and walk without difficulty when he was not sick or depressed. He had some numbness in his left hand. He did not have an active social life. He stressed that he had never been able to function well in the real world due to his psychological problems.

At the second administrative hearing, plaintiff testified

that he received monthly medical and psychological treatment at his institution, Madison Correctional.  He had previously been treated at a free clinic in Toledo for diabetes, high blood pressure, high cholesterol, chronic back pain, and psychological issues.

Plaintiff confirmed that his last job was at Applebee's.  He left that job when he moved back to Toledo to take care of his aunt.  He was able to do most household chores for her but could not do outside jobs such as mowing the lawn due to his back problems.  He thought he could lift 20 pounds and did not have much trouble walking.  He did have some pain in his upper back which at times caused him problems with his elbows and hands.  He regularly experienced numbness in his left hand.  He had recently been severely depressed but had gotten better with new medication.

Plaintiff testified to having had problems with marijuana and cocaine.  He had several years of sobriety but relapsed in 2008.  He thought that his depression would interfere with going to work every day, noting that he had never been able to sustain employment very long.

### III.  The Medical Records

The medical records in this case are found beginning on page 167 of the administrative record.  The Court summarizes the pertinent records as follows.  Most of the Court's focus will be on the records relating to plaintiff's psychological condition, since that appears to be the primary basis for his claim of disability, but the Court will also describe the records which pertain to plaintiff's physical condition.  The pages in the administrative record (that is, the transcript, or Tr.) where these various medical reports appear will be noted after each record or set of records is described.

The records relating to psychological difficulties begin as

early as 2004. That year, plaintiff was seen by Rescue Mental Health Services based on his own referral, when he reported thoughts of suicide. He also reported a very extensive substance abuse history. He was diagnosed with an adjustment disorder, an antisocial personality disorder, and polysubstance abuse. He was then hospitalized. At that time, he denied any physical problems other than irritable bowel syndrome. When his mood was stabilized he was discharged with recommendations that he stay sober and seek counseling. (Tr. 167-73).

Plaintiff was seen by a consultative examiner, Dr. Bhaiji, on December 19, 2005. At that time, he said he neither drank nor used drugs. The only conditions diagnosed were a possible ear infection or sinus infection, questionable diabetes, and non-specific psychiatric disorders. Dr. Bhaiji did not think plaintiff would have any difficulty with work-related physical activity but he might have problems hearing, speaking and traveling. He also recommended a psychiatric evaluation. (Tr. 193-95).

Plaintiff was evaluated by a consultative psychiatric examiner as well. The examiner, Dr. Pinsky, prepared a report on January 5, 2006. Plaintiff reported that he had been having psychological symptoms since he was eleven, that he had been hospitalized on three or four occasions, and that he had previously attempted suicide. He said he had no contact with his parents, child, or sister, and that he had been sober since September, 2004. He also said that medication helped with his depression and that he could concentrate if he needed to. Dr. Pinsky diagnosed major depression, rated plaintiff's GAF at 60, and concluded that he could do simple repetitive tasks but might have difficulty sustaining them. (Tr. 201-20). A state agency reviewer also evaluated plaintiff's mental capacity and generally agreed with what Dr. Pinsky reported, noting that plaintiff was

moderately limited in his ability to maintain attention and concentration and to complete a workday or work week without interruption from psychologically-based symptoms.  (Tr. 203-09).

There are a number of notes from Harbor Behavioral Healthcare from July, 2004 to January, 2007.  The initial intake assessment included impressions of depression and antisocial personality disorder with self-medication through drugs and alcohol.  Individual therapy was recommended, as was medication.  In December of 2005, plaintiff was placed on a trial of Wellbutrin.  That same month, his substance abuse was described as in early full remission.  Notes from 2006 generally show that plaintiff made some improvement, although he expressed frustration and depression at times, and that at one point he reported doing some fishing and feeling cheerful.  (Tr. 215-67).  An additional fifty pages of notes from that facility, covering the next eighteen months, are found at Tr. 307-57.  They are similar to the earlier notes and reflect that plaintiff was "focused and goal directed in his presentation" during group therapy sessions.  He expressed some boredom with having time on his hands and was thinking at one point about doing volunteer work.  He did report continuing nausea and experienced some depression when his mother died.  He also felt stress when his therapist retired.

Plaintiff was treated at St. Vincent Mercy Medical Center in 2006 following what he described as an injury at work.  He was limited to light work (twenty pound lifting limit) at that time. See, e.g., Tr. 404-05.

Plaintiff had a psychiatric hospitalization on May 13, 2009, which lasted for a week.  He had stated he was despondent and thought about killing himself.  At that time, he was not taking his medications.  He responded well to medication and was discharged in stable condition.  (Tr. 488-530).

A state agency reviewer filled out a physical residual functional capacity form on March 28, 2006. In it, he said that plaintiff did not have any exertional, postural, visual, manipulative, or environmental limitations but that he did have some communicative limitations due to his hearing deficit. (Tr. 541-48).

The only other medical record is a report from Dr. Feinsilver, the medical expert who testified at the second administrative hearing. In that report, Dr. Feinsilver (who did not interview plaintiff but only reviewed the records) rated plaintiff's ability to maintain concentration, persistence and pace as mildly impaired, his ability to perform activities of daily living as moderately impaired, and his ability to maintain social functioning as moderately to markedly impaired. He specifically pointed out that the history of arrests and legal problems indicated problems with antisocial behavior. He thought drugs and alcohol played a part in this issue to some extent. As far as specific limitations were concerned, Dr. Feinsilver said that plaintiff had only a poor ability to deal with complex instructions, a fair ability to maintain attention and concentration, a fair ability to keep to a schedule and maintain attendance, and a fair to poor ability to deal with work stress. Dr. Feinsilver ruled out any jobs with significant interaction with the general public or coworkers, and said plaintiff could do only jobs which involved simple, repetitive tasks performed apart from the general public. (Tr. 549-57).

### IV. The Medical Testimony

As noted, Dr. Feinsilver testified as a medical expert at the second administrative hearing. Dr. Feinsilver is a psychiatrist. His testimony can be found beginning at page 623 of the administrative record.

Dr. Feinsilver stated that he reviewed all of the pertinent

records and that, based on those records, he believed that plaintiff suffered from a depressive disorder, a personality disorder, and a substance abuse disorder.  None of them met or equaled any impairment described in the Listing of Impairments.  He also referred to his report, noting that plaintiff's psychological impairments were either mild or moderate except for his social functioning.  He was not asked any additional questions about the conclusions he reached in his report.

V.   The Vocational Testimony

A vocational expert, Ms. Williams, also testified at the second administrative hearing.  Her testimony begins at page 627 of the record.

She said that plaintiff's past work as a server was light and unskilled.  His work for a contractor, which included laying carpet, was heavy and had an SVP (meaning "Specific Vocational Preparation") of 7.  Laying floors would be medium with an SVP of 6, and general construction work was heavy with an SVP of 4.  It should be noted that these last three jobs, with SVPs of between four and seven, are considered either skilled or semi-skilled.

Ms. Williams was asked questions about a hypothetical individual with these abilities: the person could work at the light exertional level (lifting twenty pounds occasionally and ten pounds frequently), could only feel with the left hand on a frequent basis, did not have fine hearing ability, could do only simple, routine work with no production rate or fast-paced work, could have only occasional and superficial interaction with the public and coworkers, and could not work in tandem with others.  With those restrictions, the person could not do any of plaintiff's past work.  However, the person could, if he or she was of plaintiff's age and had his vocational background, work as an assembler, machine operator or inspector.  Limits on the ability to reach overhead more than frequently or to flex the

neck repetitively would not reduce the number of such jobs available.  However, if the person were absent more than one day per month, employment would be ruled out.

> VI.   The Administrative Law Judge's Decision

The most recent Administrative Law Judge's decision, and the one under review in this case, appears at pages 13 through 23 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff had not engaged in substantial gainful activity after his application date of September 29, 2005.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including hearing loss, diabetes, major depression, alcohol dependence, irritable bowel syndrome, polysubstance abuse, antisocial personality disorder, and degenerative disc disease.  The ALJ also found that plaintiff's impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform light work.  However, he also had some restrictions on the type of light work he could do.  With those restrictions, plaintiff was limited to frequent feeling with his left hand and no jobs requiring fine hearing capabilities and to simple routine work that is goal oriented rather than production paced (*i.e.* no fast pace).  Also, he could tolerate only occasional interaction with the general public and with coworkers, with all interaction being superficial in nature, and he could not do cooperative tasks with coworkers.  He could frequently reach overhead bilaterally but he could not do jobs requiring repetitive rotation, flexion, or extension of the neck.

The ALJ found that, with these restrictions, plaintiff could not do any of his past work, but that he could perform those jobs identified by the vocational expert such as assembler, machine operator, and inspector.  The ALJ also found that such jobs existed in significant numbers in both the national and state economies.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

### VII.  Plaintiff's Statement of Specific Errors

In his statement of specific errors (or brief on the merits), plaintiff raises the following issues: (1) that the ALJ erred in his findings about plaintiff's daily activities; and (2) that the ALJ erred by relying on answers from the vocational expert which were based on improper hypothetical questions.  In support of his first claim, he focuses primarily on the records relating to his psychological impairments and also argues that Dr. Feinsilver's opinion should not have been relied on because he was not a treating source.  In support of his second claim, he argues that the vocational expert was not asked about psychological limitations.  He also has asked the Court to direct the Madison Correctional Institution to produce his mental and physical records which have been kept since 2009.  He has repeated this request in his reply memorandum.

### VIII.  Discussion

The Court does not decide social security appeals afresh.  Rather, it is required to give a level of deference or respect to the decision made at the administrative level by the ALJ.  The Court reviews any claims of error in the ALJ's decision using this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Plaintiff's Claims of Error

Plaintiff's second argument does not appear to be supported by the record. The vocational expert was asked to assume certain psychological limitations on plaintiff's ability to work, including his need to avoid any significant contact with others (either the general public or coworkers) in the workplace, his inability to do jobs that required the performance of more than simple, routine tasks, and his need to work at a job which was not fast-paced or production oriented. These were the limitations which Dr. Feinsilver said resulted from plaintiff's depression and antisocial personality disorder. The process which the ALJ followed - first obtaining a medical opinion on what kind of limitations flow from certain psychological conditions, and then asking questions of a vocational expert that

incorporate those limitations - is precisely how the ALJ is supposed to proceed.

The process is well-explained in one of the regulations which applies to SSI claims, 20 C.F.R. §416.945.  That regulation requires the Commissioner to assess a claimant's residual functional capacity - that is, "what [the claimant] can do in a work setting" - based on "all the relevant evidence in [the] case record." §416.945(a)(1).  As far as mental limitations are concerned, the Commissioner must "assess the nature and extent of [the claimant's] mental limitations and restrictions," §416.945(c), which is different from determining what conditions a claimant suffers from; it is what effect those conditions have on the claimant's ability to do work-type functions.  As §416.945(c) also explains, the types of limitations which might exist would include "limitations in understanding, remembering and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting ...."  Those are exactly the type of limitations which the ALJ used in his hypothetical question.  Consequently, the ALJ followed the applicable regulation by looking at the medical evidence to determine if plaintiff had severe psychological impairments (which he did) and then deciding how those impairments affected "what [plaintiff] can do in the work setting."  Once the ALJ made that decision, he was allowed to ask the vocational expert if someone who could do what plaintiff could do would be employable, and the record reflects that the ALJ did just that.

However, as the Court of Appeals has said, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." <u>Ealy v. Comm'r of Social Security</u>, 594 F.3d 504,

516 (6th Cir. 2010).  This brings the Court back to plaintiff's first argument - that the assessment done by Dr. Feinsilver was not an accurate portrayal of plaintiff's psychological limitations, and that the ALJ erred in relying on it.  For the following reasons, the Court cannot agree with plaintiff on this point.

It is true that the law and regulations give special weight to the opinions of treating sources on the issue of what a social security claimant is or is not able to do.  See 20 C.F.R. §416.927(c)(2)("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight").  However, in this case there was no treating source opinion on the issue of what kind of work-related limitations were caused by plaintiff's mental impairments.  When that is the case, §416.927(e) requires ALJs to "consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and other medical experts," who are, according to §46.927(e)(2)(I), considered to be "highly qualified" and "experts in Social Security disability evaluation."  The regulation (416.927(e)(2)(ii)) goes on to say that:

> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.

Assuming the ALJ does this correctly, the ALJ may then rely on what these consultants or experts have to say. See, e.g., Hoskins v. Comm'r of Social Security, 106 Fed. Appx. 412, 415 (6th Cir. Aug. 6, 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence").

The key question in this case, then, is whether the various assessments of plaintiff's mental ability to work - assessments made by Dr. Pinsky, by the state agency reviewer, and by Dr. Feinsilver - are supported by the evidence. Here is what the ALJ said about that.

The ALJ considered all of the evidence about plaintiff's mental impairment. He read and analyzed the written statement provided by plaintiff's aunt, which confirmed that plaintiff had suffered from mental problems throughout his life but also showed that he was able to work for significant periods of time (such as at Applebee's) in spite of those problems. (Tr. 18-19). The ALJ noted that plaintiff was consistently given a GAF score of 60 during his counseling at Harbor Behavioral Services, which indicates either moderate symptoms or moderate difficulties in social functioning. (Tr. 20). The ALJ gave this rating "significant weight." He attributed a lower GAF score, when plaintiff was hospitalized in 2009, to plaintiff's relapse into drug use. The ALJ also gave great weight to Dr. Pinsky's opinion that plaintiff could work with some psychologically-caused limitations, noting that it was consistent with other evidence, including Dr. Feinsilver's opinion. (Tr. 20). The ALJ also gave great weight to Dr. Feinsilver's opinion, commenting that Dr. Feinsilver "had the opportunity to review all of the claimant's medical records and his opinion is generally consistent with the record as a whole." (Tr. 21).

The ALJ accurately represented the state of the record in his analysis. As the Court's summary of the record shows, no one expressed the opinion that plaintiff was totally disabled due to his mental impairments. The record reflects that plaintiff was able to work at various times, that his hospitalizations were influenced, at least in part, by drug use, that he did fairly well in counseling, that his condition was helped by medication, and that he had never decompensated in a work setting. The record also shows that both Dr. Pinsky and Dr. Feinsilver were specialists in mental health issues, that both considered the available records, and that both thought that although plaintiff had some severe impairments, he could still perform adequately in jobs where his impairments were taken into account. The ALJ was allowed to rely on these professionals, especially in the absence of any evidence to the contrary. Because a reasonable person, reviewing this record, could have come to the same conclusion as the ALJ, by law that conclusion is supported by "substantial evidence." Also, by law, this Court cannot substitute its own judgment for that of the ALJ when the ALJ's decision is adequately supported by the record. "In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record." Rogers v. Comm'r of Social Security, 486 F.3d 234, 241 (6th Cir. 2007). As the Court's analysis of the ALJ's decision demonstrates, that is the case here.

### B. Prison Medical Records

The only other issue which plaintiff has raised (and which the Commissioner's memorandum does not address) is the production of plaintiff's records of treatment while he has been incarcerated at the Madison Correctional Institution. Plaintiff asserts that the prison officials will not produce them, and he has asked this Court to order their production.

There are several problems with this request given the fact that it has been made in a case in which no prison official is a party. Ordinarily, any order from a court directing a non-party to produce documents must be preceded by the service of a subpoena for those documents; otherwise, the Court has no jurisdiction to order the non-party to take any action. See, e.g., Highland Tank & Mfg. Co. V. PS Intern., Inc., 227 F.R.D. 374, 379 (W.D. Pa. 2005) ("Rule 45 is the only discovery method whereby information may be obtained from a nonparty to the suit"). No such subpoena has been requested or issued in this case.

Further complicating the issue, discovery of any sort - whether directed to parties or nonparties - is not permitted in a social security appeal, because the Court's review of the ALJ's decision in such a case is limited to the existing record. As this Court has previously recognized,

> Requests for discovery are not common in social security disability cases. Such cases are ordinarily decided based upon the record of administrative proceedings which occur before the Secretary. According to 42 U.S.C. § 405(g), the Court's review is based upon "a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."

Dawson v. Sullivan, 136 F.R.D. 621, 622 (S.D. Ohio 1991). If additional evidence is to be obtained, it must be done following a remand to the Commissioner. Igonia v. Califano, 568 F.2d 1383, 1389 (D.C. Cir. 1987). That kind of remand, ordered under sentence six of 42 U.S.C. §405(g), is justified only if there is new and material evidence which the ALJ did not have the chance to consider, and if there is good cause for the claimant's failure to submit the evidence during the original administrative proceeding. "The party seeking a remand bears the burden of showing that these two requirements are met." Hollon ex rel. Hollon v. Comm'r of Social Security, 447 F.3d 477, 483 (6th Cir.

2006).

   Plaintiff has not suggested in any way how his institutional treatment records might shed new light on the question of disability.  Under Ohio law, "[t]here is an established procedure by R.C. 5120.21(C)(2) which provides inmates access to their medical records."  State ex rel. Arnold v. Belmont Corrections Infirmary, 123 Ohio App. 3d 183, 185 (Belmont Co. App. 1997).  As this Court said in Dearing v. Mahalma, 2012 WL 524438, *3 (S.D. Ohio Feb. 16, 2012), "[i]n order to merely *review* his or her own medical records, a prisoner must complete a form and schedule an appointment."  See also ODRC Policy Number 07-ORD-11(VI)(F), which provides that "[o]ffenders wishing to review their personal current active medical record may do so once each quarter by sending a request in writing to the institution Health Care Administrator" and that "[t]he Health Care administrator will arrange a convenient time for the offender to review his or her medical record."  The policy also permits the inmate to take notes during the review.

   Had plaintiff reviewed his records under this policy and provided the Court with some evidence (perhaps by way of an affidavit or declaration under penalty of perjury) that those records contain information which might have influenced the ALJ to decide plaintiff's SSI application differently, there would then be a question about whether a sentence six remand should be ordered.  However, that has not happened.  The Court is simply powerless to order a sentence six remand when it is completely in the dark as to the content of any additional records which might be presented to the ALJ.  The Court notes, parenthetically, that if plaintiff is complaining that he has followed the ODRC policy but has been denied access to his records, he might have a state court remedy to enforce the regulation, but it would, of course, be subject to any requirements that he exhaust the prison grievance procedure and otherwise qualify for relief.  These are

not issues which can be addressed in the context of an SSI appeal in a federal court.

## IX. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that the Court enter judgment in favor of the defendant Commissioner of Social Security.

## X. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge